**Opinion issued August 16, 2016**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-15-00167-CR

————————————

**JOSHUA JACOB PATTERSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 240th District Court**
**Fort Bend County, Texas**
**Trial Court Case No. 11-DCR-058778**

---

### OPINION ON REHEARING\*

A jury found Joshua Jacob Patterson guilty of murder and assessed

punishment at 50 years' confinement and a $1,000 fine. In nine issues, Patterson

---

\* We deny rehearing, withdraw our opinion and judgment dated June 21, 2016, and issue this opinion and judgment in their place.

contends that his conviction should be reversed because:

(1) under the doctrine of *in pari materia*, he should have been indicted for engaging in organized criminal activity rather than murder;

(2) the trial court erroneously admitted evidence of an extraneous aggravated robbery;

(3) he was not given all of the custodial warnings required by Section 3(a)(2) of Article 38.22 of the Code of Criminal Procedure and his interrogation was therefore wrongly admitted into evidence; and

(4) his trial counsel was ineffective.

We affirm the trial court's judgment.

## Background

A grand jury indicted Patterson for the murder of Kristian Sullivan, who died of multiple gunshot wounds in the front yard of his grandmother's house. Patterson filed a pre-trial motion to suppress any statement he had made to law enforcement officers. In this motion, he asserted several bases for suppression, including that his statements "were taken without the safeguards required by and in violation of Article 38.22 of the Code of Criminal Procedure." But Patterson did not secure a ruling on the motion before or during trial.

Patterson also filed a pretrial motion requesting notice of any other crimes or wrongs that the State intended to introduce under Rule 404(b) of the Texas Rules of

2

Evidence. The State responded by disclosing an aggravated robbery of a Houston-area EZ Money Loan Service that postdated the charged offense. The trial court later granted Patterson's motion in limine regarding the "commission of any extraneous or unadjudicated criminal acts or bad acts," excepting marijuana use. The record makes clear the trial court made this ruling after the issue was discussed off the record in chambers.

The State's theory of the case was that Patterson and other members of the criminal street gang "100 Click" planned and carried out the murder of Sullivan, a member of the rival gang "F.A.B.," in retaliation for an earlier gang-related shooting. The defense disputed that Patterson was an active member of 100 Click and claimed that he did not know that the gang intended to kill Sullivan. The defense's theory was that Patterson drove Sterlyn Edwards and Antonnyer Morrison, one or both of whom shot Sullivan, to and from the murder scene without knowing they planned to shoot Sullivan. According to defense counsel, Patterson mistakenly believed he was driving the group to Sullivan's house to buy marijuana. Counsel told the jury that the evidence would show that Patterson had dissociated from the gang and that he was simply "in the wrong place at the wrong time with the wrong people." Defense counsel also requested that jurors keep in mind several questions as they heard the evidence, including whether there was "any documentation other than law enforcement speculation" regarding Patterson's alleged gang membership. Counsel

3

argued that, if jurors answered this question in the negative, they would "have a reasonable doubt" and should render a verdict of "not guilty."

Multiple law enforcement officers testified for the State, including K. Tullos, a peace officer with the Missouri City Police Department who was assigned to investigate gang-related crimes and who investigated Sullivan's murder. Tullos testified about 100 Click and F.A.B.[1] and about the violent rivalry between these two gangs. In particular, he stated that a F.A.B. member allegedly shot a member of 100 Click a couple of weeks before Sullivan's murder. Tullos testified that Sullivan was a member of F.A.B. and that the men Patterson drove to and from Sullivan's house— Edwards and Morrison—were members of 100 Click or an affiliated gang known as the "Young Ones."

Tullos discussed the criteria that the State uses to classify someone as a gang member. He testified that he classified Patterson as a member of 100 Click based on social media postings in which Patterson associated with known gang members and displayed a hand sign associated with the gang. Tullos also relied on interviews with Edwards and others in identifying Patterson as a member of 100 Click. Tullos conceded on cross-examination that he had discretion to decide whether Patterson met the criteria, and that he had not encountered Patterson engaging in any gang-

---

[1] According to Tullos, F.A.B. stands for Forever About Bread, with "Bread" being a reference to money.

4

related activity before Sullivan's murder. Tullos also conceded that none of the photographs of Patterson that law enforcement obtained from social media depicted criminal activity and that Tullos did not know when these photographs had been taken. Defense counsel revisited several of the State's criteria for documenting a person as a gang member and Tullos agreed that Patterson did not satisfy some of them. Specifically, Tullos acknowledged that Patterson had not admitted gang membership, did not have any gang-related tattoos, had not visited any incarcerated gang members, and had not previously been seen in a gang-related location.

After Tullos's cross-examination, the State argued that by raising lack of evidence of Patterson's gang involvement as a defense, the defense had opened the door to proof of the EZ Money aggravated robbery, which Patterson and Edwards allegedly committed together two to three months after Sullivan's murder. The defense objected that it had not opened the door and that the danger of unfair prejudice associated with this evidence substantially outweighed its probative value. The trial court overruled Patterson's objections to the admission of this extraneous aggravated robbery. Tullos then testified on re-direct that committing a crime with a known gang member is a criterion used by law enforcement authorities when assessing gang membership. He stated that he assisted in the investigation of the EZ Money aggravated robbery, in which law enforcement officers identified Edwards as one of the robbers based on fingerprint evidence. Tullos identified Patterson as

5

the other robber based on still photographs taken from video surveillance footage. The State introduced these photos into evidence without objection.

R. Ramirez, a patrol sergeant with the City of Sugar Land Police Department, also testified for the State. At the time of the murder investigation, Ramirez was a supervisor of a special crimes unit that was comprised of law enforcement authorities in Sugar Land, Stafford, and Missouri City. The unit's purpose was to investigate gang crimes and street-level narcotics. Ramirez testified about the history of violence between 100 Click and F.A.B., noting that a person associated with 100 Click had been shot a couple of weeks before Sullivan's murder.

Ramirez also testified that he conducted a videotaped interview of Patterson, which the trial court admitted over a hearsay objection. During the interview, Patterson initially denied any involvement in Sullivan's murder, but eventually admitted that he drove Edwards and Morrison to and from the murder scene. He claimed in the interview that he did not know that Edwards and Morrison intended to kill Sullivan. Patterson insisted that he was not an active member of 100 Click and that he drove Edwards and Morrison to the scene of the crime believing that they were going to buy marijuana.

After Patterson's videotaped interview was played for the jury, Ramirez resumed his testimony. Ramirez testified that Edwards was the first person to implicate Patterson and conceded on cross-examination that Edwards told multiple,

6

conflicting versions of the events surrounding Sullivan's murder. But Ramirez stated that Edwards ultimately told law enforcement officers that Patterson not only was the driver but also had been involved in the planning of Sullivan's murder and that the motive for the murder was gang-related retaliation.

The State also called as witnesses two young women who were with Patterson, Edwards, and Morrison on the evening of Sullivan's murder. Kandace Hall, who had a romantic relationship with Patterson, testified that she knew that Edwards, Morrison, and Patterson were members of 100 Click. Hall stated she and these three men left the location at which they were hanging out on the night of Sullivan's murder to purchase marijuana. Before they left, Patterson put a backpack in which he kept a gun in the car's trunk. Patterson drove while Edwards gave him directions. Once they arrived at their destination, Edwards and Morrison got out of the car and walked down the street. After a few minutes, Edwards and Morrison came running back to the car. Hall testified that Patterson backed the car up to meet them. When Edwards and Morrison got into the car, Hall saw that Edwards had the gun that Patterson kept in his backpack and Edwards said that he shot "him" without specifying whom he shot. Patterson did not ask who had been shot; he merely asked whether Edwards and Morrison had gotten the marijuana. Hall testified that there was no further conversation about the shooting, and that Patterson drove away from the scene. Hall also testified that Edwards and Patterson subsequently placed the

7

gun under the hood of the car and that Patterson retrieved it from under the hood when she later dropped him off at home.

Hall's best friend, Samon Williams, also testified. Williams stated that she and Hall had been hanging out with some members of 100 Click, including Patterson, the evening of Sullivan's murder. But when another man named Tracy arrived, she left with him. Later, Hall, Patterson, Morrison, and Edwards arrived at Tracy's house to pick up Williams. Williams testified that the men were talking and seemed normal, but that Hall was shaking and scared. The five of them left Tracy's house, and Williams and Hall dropped Patterson, Morrison, and Edwards off at their respective homes. When they reached Patterson's home, Williams testified that he asked her to pop the hood and then retrieved a gun from under it.

In her closing argument, defense counsel argued that the jury had "not heard one single piece of evidence" that linked Patterson with Sullivan's murder other than that "he was in the wrong place at the wrong time" with the "wrong people." She also argued that Patterson denied being an active gang member, and that no witness could testify about any supposed gang activity on his part.

The jury rendered a guilty verdict and assessed punishment at 50 years' confinement and a $1,000 fine. Patterson filed a motion for new trial, in which he complained of the admission of evidence relating to the aggravated robbery and his gang affiliation. The trial court denied the motion.

8

**Discussion**

**A.    Murder and organized crime statutes are not *in pari materia***

In his first issue, Patterson contends that the State violated his right to due process by prosecuting him for murder rather than for engaging in organized criminal activity.  He argues that Section 19.02 of the Penal Code, which defines murder, and Section 71.02 of the Penal Code, which defines organized crime, address the same subject matter and conflict.  Therefore, he argues that the doctrine of *in pari materia* required that he be prosecuted under the more specific organized crime statute, not under the more general murder statute.

**1.    Applicable law**

The doctrine of *in pari materia* confers on defendants a due process right to be prosecuted under a narrower, more specific statute when it irreconcilably conflicts with a broader statute addressing the same subject.  *Azeez v. State*, 248 S.W.3d 182, 191–92 (Tex. Crim. App. 2008).  But the doctrine does not apply in every instance in which two statutes address the same subject; it does not apply if the two statutes "have different objects, intend to cover different situations, and are not intended to be considered together."  *Johnson v. State*, 882 S.W.2d 39, 41–42 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd).

In deciding whether two statutes address the same subject matter for purposes of the doctrine, we consider whether they (1) are contained in the same legislative

enactment, (2) have the same elements of proof, (3) impose different penalties, and (4) are written to achieve the same purpose or objective. *Bearnth v. State*, 361 S.W.3d 135, 141–42 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *Hollin v. State*, 227 S.W.3d 117, 121 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). Similarity of purpose is the most significant of these four factors. *Bearnth*, 361 S.W.3d at 142; *Hollin*, 227 S.W.3d at 121. If the statutes were not enacted with the same purpose in mind, they do not address the same subject matter for purposes of the *in pari materia* doctrine. *Burke v. State*, 28 S.W.3d 545, 547 (Tex. Crim. App. 2000). Moreover, even when two statutes address the same subject, they do not irreconcilably conflict with one another unless "only one of them can apply to a particular situation." *Lomax v. State*, 233 S.W.3d 302, 312 (Tex. Crim. App. 2007). That two statutes both might apply to the same conduct in some situations does not mean that they irreconcilably conflict with one another. *Id.*

Whether two statutes are *in pari materia* is a question of law. *Garrett v. State*, 424 S.W.3d 624, 629 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd). We therefore review this issue de novo. *Id.*

### 2. Analysis

A person commits the offense of murder if he:

(1) intentionally or knowingly causes the death of an individual;

(2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; or

10

> (3) commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

TEX. PENAL CODE § 19.02(b). A person commits the offense of engaging in organized criminal activity if he commits or conspires to commit any one of a number of specified offenses, including murder, "with the intent to establish, maintain, or participate in a combination or in the profits of a combination or as a member of a criminal street gang." TEX. PENAL CODE § 71.02(a)(1).

Sections 19.02(b) and 71.02(a)(1) of the Penal Code do not address the same subject. First, they are not part of the same legislative enactment. Section 19.02(b) is part of Title 5 of the Penal Code, which concerns offenses against the person. Section 71.02(a)(1) is part of Title 11 of the Penal Code, which concerns organized crime.

Second, the two offenses have different elements. A person commits an offense under Section 71.02(a)(1) by committing or conspiring to commit a wide variety of predicate crimes "with the intent to establish, maintain, or participate in a combination or in the profits of a combination or as a member of a criminal street gang." TEX. PENAL CODE § 71.02(a). Murder is one of the predicate crimes that will support an organized criminal activity conviction. *Id.* § 71.02(a)(1). But murder

does not require the specific intent required by the organized criminal activity statute. *Compare id.* § 19.02, *with id.* § 71.02(a).

Patterson correctly points out that the version of the organized crime statute in effect at the time of the murder imposed the same potential range of punishment as the murder statute. *See* TEX. PENAL CODE § 71.02(b) (version in effect from Sept. 1, 2009 to Aug. 31, 2011). We note, however, that the current versions of the two offenses carry different penalties. *See* TEX. PENAL CODE §§ 12.32, 19.02(b)(1), (c) (murder a first-degree felony punishable by imprisonment "for life or for any term of not more than 99 years or less than 5 years" and "a fine not to exceed $10,000"); *id.* at § 71.02(b)(3) (organized criminal activity involving murder currently punishable by imprisonment for "life or for any term of not more than 99 years or less than 15 years"). In any event, although this factor supports Patterson's argument, the provision of the same penalties alone does not render two offenses *in pari materia. See Chambless v. State*, 411 S.W.3d 498, 501 (Tex. Crim. App. 2013) (statutes' purposes accorded "greater significance among the factors").

Most significantly, the offenses were not written to achieve the same purpose or objective. The murder statute broadly prohibits and punishes the unjustified killing of a person regardless of purpose or motive. *See id.* § 19.02. The organized criminal activity statute, by contrast, is intended to deter organized crime by punishing it more severely. TEX. PENAL CODE § 71.02(b); *see also McDonald v.*

*State*, 692 S.W.2d 169, 172 (Tex. App.—Houston [1st Dist.] 1985, pet. ref'd) (organized criminal activity statute "is an obvious attempt to discourage and deter" organized crime by punishing it more severely based on "the legislature's recognition that organized criminal activity is more dangerous to the welfare of the state than unorganized activity"). Having considered the four relevant factors, we conclude that Penal Code Sections 19.02(b) and 71.02(a)(1) are not addressed to the same subject. *Burke*, 28 S.W.3d at 547.

Moreover, Patterson has not identified an irreconcilable conflict between these statutes and we discern none. Both statutes might apply to the same conduct in some situations. *See* TEX. PENAL CODE § 71.02(a)(1) (incorporating murder as one predicate offense that may constitute engaging in organized criminal activity when committed with requisite purpose or motive). But the fact that two criminal statutes might apply to the same situation does not mean that they irreconcilably conflict with one another. *Lomax*, 233 S.W.3d at 312.

In conclusion, we hold that the doctrine of *in pari materia* does not apply because Section 19.02(b) and Section 71.02(a)(1) do not address the same subject or irreconcilably conflict with one another. Because the doctrine does not apply, the State had discretion to prosecute Patterson under Section 19.02(b). *See Burke*, 28 S.W.3d at 547; *Hollin*, 227 S.W.3d at 122.

We overrule Patterson's first issue.

**B.     No abuse of discretion or prosecutorial misconduct in the admission of extraneous offense evidence**

In his second issue, Patterson contends that the State misled the trial court by arguing that the defense opened the door to evidence about Patterson's extraneous aggravated robbery with Edwards. He also argues that his counsel did not open the door to this evidence in her opening statement or cross-examination of witnesses. Relatedly, in his eighth issue, Patterson contends the trial court erred by failing to balance the probative value of the aggravated robbery against its potential for unfair prejudice before admitting it during the guilt-innocence phase of trial.

**1.     Applicable law**

To preserve error, a party must object with specificity in the trial court and the error the party asserts on appeal must conform to the objection made at trial. *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012). The requirement of a proper objection extends to most errors, including prosecutorial misconduct. *Penry v. State*, 903 S.W.2d 715, 764 (Tex. Crim. App. 1995); *Hajjar v. State*, 176 S.W.3d 554, 566 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd). Therefore, a party may not assert prosecutorial misconduct for the first time on appeal. *Hajjar*, 176 S.W.3d at 566.

In general, evidence of other crimes is not admissible to prove bad character or conduct in conformity, but may be relevant and admissible for other purposes like proving motive, intent, or absence of mistake, during the guilt-innocence phase of trial. TEX. R. EVID. 404(b); *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App.

14

2011).  Thus, defense counsel may open the door to proof of other crimes by putting motive, intent, or mistake at issue in an opening statement or during the cross-examination of the State's witnesses.  *Powell v. State*, 63 S.W.3d 435, 438–40 (Tex. Crim. App. 2001); *Cantu v. State*, 395 S.W.3d 202, 213 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd); *Blackwell v. State*, 193 S.W.3d 1, 11–13 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd).  Like any other issue concerning the admissibility of evidence, whether a defendant has opened the door to evidence of other crimes is a matter within the trial court's discretion.  *See Bowley v. State*, 310 S.W.3d 431, 435 (Tex. Crim. App. 2010); *Green v. State*, 934 S.W.2d 92, 101–02 (Tex. Crim. App. 1996).  So long as the trial court's ruling is within the zone of reasonable disagreement, there is no abuse of discretion.  *Devoe*, 354 S.W.3d at 469. The court's decision to admit proof of other crimes is generally within this zone if the evidence "is relevant to a material, non-propensity issue."  *Id.*

If the defendant objects to the admission of extraneous offense evidence on the basis that its potential for unfair prejudice substantially outweighs its probative value, then the trial court must weigh the relevance of the evidence against its prejudicial impact.  TEX. R. EVID. 403; *Johnston v. State*, 145 S.W.3d 215, 219–20 (Tex. Crim. App. 2004).  But it "need not conduct a formal hearing or even announce on the record that it has mentally conducted this balancing test."  *Cruz v. State*, 122 S.W.3d 309, 313 (Tex. App.—Houston [1st Dist.] 2003, no pet.).  Rule 403 favors

15

admissibility of relevant evidence and carries with it a presumption that probative evidence is more probative than prejudicial. *Hajjar*, 176 S.W.3d at 562. Factors we consider include: (1) how compellingly the evidence of the other crime makes a fact of consequence more or less probable; (2) the evidence's potential to affect the jury in an irrational and incurable way; (3) the degree of delay and distraction caused by the presentation of this extraneous evidence; and (4) the proponent's need for the particular evidence in light of the other admissible proof. *Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997); *Hajjar*, 176 S.W.3d at 561. If these factors, "viewed as objectively as possible, lead to the conclusion that the danger of unfair prejudice substantially outweighed the probative value of the proffered evidence," we "should declare that the trial court erred in failing to exclude it." *Montgomery v. State*, 810 S.W.2d 372, 392 (Tex. Crim. App. 1991) (op. on reh'g).

### 2. Analysis

At trial, defense counsel argued that Patterson had not opened the door to evidence of the extraneous aggravated robbery and further objected that any probative value it might possess was substantially outweighed by the danger of unfair prejudice. Defense counsel did not assert that the State misled the court or otherwise engaged in prosecutorial misconduct. Thus, Patterson has not preserved any alleged prosecutorial misconduct issue for appellate review. *See Penry*, 903 S.W.2d at 764; *Hajjar*, 176 S.W.3d at 566.

16

To the extent that Patterson argues that defensive theories advocated in an opening statement or advanced through cross-examination cannot open the door to proof of other crimes as a matter of law, the decisions of the Court of Criminal Appeals and this court are to the contrary. *Powell*, 63 S.W.3d at 438–40; *Cantu*, 395 S.W.3d at 213; *Blackwell*, 193 S.W.3d at 11–13. Instead, the salient question is whether the district court abused its discretion in deciding that Patterson's defensive theory made evidence of his participation in a gang-related robbery relevant.

The principal disputes at trial concerned Patterson's alleged membership in 100 Click and his role in the shooting of Sullivan. The defense maintained that Patterson was not an active member of the gang and had no idea his companions, who were gang members, intended to harm Sullivan. In her opening statement, defense counsel acknowledged that Patterson drove the car that transported the shooter or shooters to and from the murder scene, but argued that Patterson was not an active gang member and did so believing they were merely going there to buy marijuana. Defense counsel advocated that the evidence would show that Patterson simply was in the wrong place at the wrong time with the wrong people. Defense counsel also pursued this defensive theory during her cross-examination of Tullos by calling into question the alleged proof that Patterson was a member of 100 Click and establishing that Patterson played no known role in any prior gang-related violence. Consequently, the trial court reasonably could have concluded that

Patterson's alleged participation in an extraneous aggravated robbery with a member of 100 Click was relevant, on the basis that it made less probable the defense's theory that Patterson unwittingly transported gang members to the scene of the murder. The trial court likewise could have reasonably concluded that proof of the extraneous robbery rebutted the defense's claim that Patterson had not been involved in violent gang-related crime. We therefore conclude that the trial court did not abuse its discretion by implicitly finding that the defense opened the door to proof concerning the aggravated robbery. *See Blackwell*, 193 S.W.3d at 11–13.

By overruling Patterson's Rule 403 objection, the trial court implicitly concluded that the danger of unfair prejudice did not substantially outweigh the probative value of the aggravated robbery. *See Cruz*, 122 S.W.3d at 313. Analysis of the four factors confirms the trial court's ruling was not an abuse of discretion.

First, the trial court could have reasonably concluded that evidence of Patterson's participation in an extraneous robbery with a known gang member was some proof that Patterson was a member of 100 Click and involved in its criminal activities, and that this in turn made it more probable that he had a motive to participate in Sullivan's murder. *See Smith v. State*, 355 S.W.3d 138, 154 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (gang membership admissible to show motive and intent or to refute defensive theories).

Second, the trial court could have reasonably concluded that the proof regarding the extraneous robbery was not likely to affect the jury in an irrational way. The proof was not gruesome or emotionally charged. *See McGregor v. State*, 394 S.W.3d 90, 120–21 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (second factor entails consideration of "the 'emotional weight' of the extraneous offense evidence and whether that evidence was 'graphic'").

Third, the trial court could have reasonably concluded that the evidence would not cause substantial delay or distraction. The evidence consisted of still photographs from surveillance footage at the location of the robbery and Tullos's brief testimony about the robbery.

Fourth, given the defense's theory that Patterson was not an active member of 100 Click, the trial court could have reasonably concluded that the prosecution had significant need for contrary proof to rebut the defense's theory that Patterson innocently found himself in the wrong place in the company of the wrong people at the time of Sullivan's murder. We therefore conclude that the trial court did not abuse its discretion by implicitly deciding that the robbery's probative value was not substantially outweighed by the danger of unfair prejudice. *See Santellan*, 939 S.W.2d at 169; *Hajjar*, 176 S.W.3d at 561.

We overrule Patterson's second and eighth issues.

**C.    No error preserved regarding construction of Article 38.22**

In his ninth issue, Patterson contends that the trial court erred by failing to strictly construe the statutory requirement that law enforcement officers warn the subject of a custodial interrogation that he may terminate the interview at any time.

### 1.    Applicable law

Law enforcement officers are required to provide several warnings to anyone in custody whom they interrogate, including an admonition that the person may terminate the interview at any time.  TEX. CODE CRIM. PROC. art. 38.22, §§ 2(a)(5), 3(a)(2).  Any resulting statement is not admissible unless law enforcement officers provide this warning or its "fully effective equivalent."  *Id.* § 3(e)(2); *see also Nonn v. State*, 41 S.W.3d 677, 679 (Tex. Crim. App. 2001) (substantial compliance with Article 38.22's warnings requirements necessary).

In order to preserve a complaint regarding Article 38.22's requirements for appellate review, a defendant must raise the issue with specificity in the trial court. *Resendez v. State*, 306 S.W.3d 308, 313 (Tex. Crim. App. 2009).  A general assertion that law enforcement officers took a videotaped statement "without the safeguards required by and in violation of Article 38.22 of the Code of Criminal Procedure" is not sufficient to preserve error, as Article 38.22 contains a number of discrete subsections that might be applicable to any given videotaped statement. *Id.*; *accord Leza v. State*, 351 S.W.3d 344, 353 & n.28 (Tex. Crim. App. 2011).

20

## 2. Analysis

Patterson filed a motion to suppress any statements made to law enforcement officers. He asserted multiple bases for suppression, including that his statements "were taken without the safeguards required by and in violation of Article 38.22 of the Code of Criminal Procedure." But Patterson did not specify any particular violation of Article 38.22, and defense counsel informed the trial court that she was "going to pass on that motion" without seeking a ruling. Because Patterson raised Article 38.22 without specifying any particular violation of the statute and declined to present his suppression motion to the trial court, the trial court never had an opportunity to construe or apply the statute. Patterson therefore has not preserved this issue for review. *Leza*, 351 S.W.3d at 353 & n.28; *Resendez*, 306 S.W.3d at 313.

We overrule Patterson's ninth issue.

## D. The record does not show ineffective assistance of counsel

In his third, fourth, fifth, sixth, and seventh issues, Patterson contends that his trial counsel provided ineffective assistance by failing to:

- move for a mistrial after the trial court overruled Patterson's objections to the admissibility of the extraneous aggravated robbery;

- obtain a ruling on his written motion to suppress by requesting that the trial court determine whether Patterson was in custody when law enforcement officers took his videotaped statement;

- object to the admissibility of Patterson's videotaped statement on the basis that it was taken in violation of his statutory right to be warned that he could end the interview at any time;

- object to the admissibility of Patterson's videotaped statement on the basis that he did not waive his statutory right to terminate the interview at any time; and

- object to the admission of Patterson's videotaped statement on any basis other than hearsay.

### 1. Applicable law

To prevail on his claim of ineffective assistance, Patterson must prove that his trial counsel's performance fell below an objective standard of reasonableness and that this deficiency prejudiced his defense. *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011) (citing *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984)). Patterson bears the burden of proof on both issues, and failure to make either showing by a preponderance of the evidence will defeat his ineffectiveness claims. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). His counsel's effectiveness must be evaluated based on the totality of the representation

rather than isolated acts or omissions. *Scheanette v. State*, 144 S.W.3d 503, 509 (Tex. Crim. App. 2004). But trial counsel's failure to object to admissible evidence or request a mistrial on the basis of admissible evidence is not deficient performance as a matter of law. *Ex parte Jimenez*, 364 S.W.3d 866, 887 (Tex. Crim. App. 2012).

Unless the record shows that trial counsel's acts were not the product of strategic decision-making, we presume that her performance was adequate so long as the challenged conduct is not so outrageous that no competent attorney would have engaged in it. *State v. Morales*, 253 S.W.3d 686, 696–97 (Tex. Crim. App. 2008). Patterson, therefore, must show that no plausible reason exists for the particular acts or omissions about which he complains. *Bone v. State*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002). His ineffective assistance claims cannot rest on speculation; they must be firmly founded in the record. *Id.* at 835. If we can only speculate as to why trial counsel behaved as she did, the presumption of adequate performance remains unrebutted. *Scheanette*, 144 S.W.3d at 510. Thus, we "ordinarily need to hear from counsel whether there was a legitimate trial strategy for a certain act or omission." *Andrews v. State*, 159 S.W.3d 98, 103 (Tex. Crim. App. 2005).

## 2. Analysis

### a. Counsel was not deficient by failing to move for mistrial

Patterson argues that his trial counsel should have moved for a mistrial after the trial court admitted evidence of his extraneous aggravated robbery over his objection. But we have held that the trial court did not abuse its discretion by admitting this evidence. Thus, counsel was not deficient for failing to seek a mistrial based on its admission. *See Ex parte Jimenez*, 364 S.W.3d at 887 (failure to move for mistrial based on admission of admissible evidence is not ineffective assistance).

We overrule Patterson's third issue.

### b. Record is insufficient to assess other ineffective assistance claims

Patterson argues that his trial counsel should have objected or taken other measures to secure exclusion of his videotaped statement. But Patterson did not raise this issue in his motion for new trial, and therefore the record contains no evidence concerning his trial counsel's decision-making regarding the statement. Given that Patterson's videotaped statement is consistent with his trial defense—that he drove the shooter or shooters to the murder scene but did not know that murder was the purpose of the trip—we cannot say that trial counsel's failure to seek its exclusion on the bases identified by Patterson was so outrageous that no competent attorney would have done so. Because we can only speculate in this regard,

24

Patterson has not rebutted the presumption that his trial counsel's performance was adequate. *Scheanette*, 144 S.W.3d at 510.

We overrule Patterson's fourth, fifth, sixth, and seventh issues.

## Conclusion

We affirm the trial court's judgment. All pending motions are dismissed as moot.


Rebeca Huddle
Justice

Panel consists of Justices Keyes, Brown, and Huddle.

Publish. TEX. R. APP. P. 47.2(b).