

# NUMBER 13-23-00439-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

ANTHONY ELIFF III A/K/A
ANTHONY ELIFF,                                                                    Appellant,

v.

THE STATE OF TEXAS,                                                              Appellee.

## ON APPEAL FROM THE 107TH DISTRICT COURT
## OF CAMERON COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Chief Justice Tijerina and Justices Peña and West
Memorandum Opinion by Justice West**

Appellant Anthony Eliff III a/k/a Anthony Eliff was convicted of murder (Count I), a first-degree felony, and unlawful possession of a firearm by a felon (Count II), a third-degree felony. *See* TEX. PENAL CODE ANN. §§ 19.02(b)(1), (c), 46.04(a)(1), (e). Appellant argues that the trial court committed reversible error when it (1) denied his motion to

suppress his confession to law enforcement, (2) denied his request for an instruction on self-defense against multiple assailants, and (3) allowed the State to introduce evidence of a second pending murder charge against appellant. We affirm.

## I. BACKGROUND

The facts at trial generally established that the deceased, Guillermo Garcia, died by a gunshot wound to the chest inflicted by appellant after a confrontation in front of their home. Appellant advanced a self-defense theory.

Alexander Hernandez testified that appellant and Garcia each rented a room in his house, and the three were roommates in the weeks leading up to the shooting. Hernandez testified that he had recently evicted Garcia because he was not paying rent and tensions between Garcia and appellant had created "a bad environment." The jury also heard evidence that Garcia "tried to jump" appellant a week prior to the shooting and allegedly held a knife to his neck. According to Hernandez, on the date in question, Garcia stopped by the house around 10 p.m. to pick up crack cocaine, and appellant was going to stop by later in the night to supply Hernandez with crack cocaine. However, appellant arrived shortly after Garcia.

Video footage from a neighboring home of the shooting was admitted as evidence and played for the jury. The footage shows Garcia's vehicle drive up and park on the street in front of the residence. Appellant's pickup truck drives by the residence about a minute later and parks in front of Garcia's vehicle. An argument ensues, and a passenger in Garcia's vehicle, Ernesto Vargas, emerges and runs to the front door of the residence as a loud bang is heard. Appellant goes back into his vehicle and drives away. Cheyenne Rivera, appellant's girlfriend at the time, can be seen exiting appellant's pickup truck from

2

the passenger seat, watching the argument, and then returning to the truck and driving away with appellant.

Vargas testified that after appellant parked in front of Garcia's vehicle, he came up to the driver's side window and the two began arguing. At some point, appellant pulled out his gun. Vargas testified about the moments leading up to the shooting: "And I go, he's not going to shoot him, he's not going to shoot him, and [Garcia]—he just pushes him, wants to fight him, like put away that gun, man. And then he goes . . . 'You ain't about that life,' and then [appellant] goes, 'I'm about that life.'" He estimated that the argument lasted about thirty seconds before appellant shot Garcia. Vargas, fearing he would also be shot, jumped out of the car as appellant fired the gun and ran to the residence. Vargas testified that he and Garcia were unarmed.

While incarcerated, appellant wrote a letter about the encounter to a friend. The letter was admitted into evidence without objection. It stated in relevant part:

So just wanting to stop and pick something up from my home, . . . I noticed a truck that I hadn't seen in over a week blocking my driveway. Threat.

So I and my companion in a two-seater Silverado pulled up ahead of them and side saddle park. His door already opened, door light on, allowing cameras across the street to catch what would be a moment in my life. I open my door to look back at him and say, what's up?

He nonchalantly, with one leg on his open door, says in return, what's up?

me: WTF you doing here?
him: None of your [expletive] business!!!
(me: Jumping out of truck) Well, what's up?
him: WHATS UP?!! Cussing, attitude, etc. etc.

Halfway to the end of my truck bed, I realize this [expletive] is toooo laid back. So in concern, I return to the cab of the truck to grab the 45. As I do in one motion, I snap and cock that . . . tail back, and in what I will call a fleeting moment, walked towards his laidback ass. His homie, assuming the

3

same, that I []was just some ho ass punk that was "crying" last week and wasn't about that life[.]

His door swung open, to where it gave him (armor) and a (second on me) if he had a weapon—[]still to this day, I don't know[. ]But I was in fear of my life and those around me that I weaved that door, walked up to his still (laid back ass), placed the muzzle against his sweater, and blasted. *PA!!!! Single and Crisp. His homie did the right thing . . . and dipped.

I, not wanting a shootout with said homie, I returned to my truck and calmly drove off. Called the cops in the morning to set up a meeting where I could discuss the situation—had 2 grams of chowder on me—[a]nd surprised and arrested[,] charged with possession of dope and murder. Still have yet to be indicted.

Self-defense is obvious here, my [expletive]. As I returned for the peace, [sic] he was blocking access to my home. He had already assaulted me a week prior. The owner of the home said he wasn't allowed on [the] property[,] his menacing stance. All on video. . . .

But before the bullet passed through, he was no longer laid back, but had a look of shock, disbelief or regret. It's a face I'll never forget for the rest of my life. . . .

(Emphasis in original omitted).

Another jailhouse letter from appellant, written to Nora Lee Nino, his ex-girlfriend and mother of his child, was entered into evidence without objection. In that letter, appellant discussed his pending indictment for the murder of Elyn Loera, his former ex-girlfriend, and contended that his cousins Rudy and Leo murdered her "because they didn't want [appellant] to leave with the money" he inherited from his mother:

Remember when [Loera] came & felt the need to leave after our argument, well they say they found her body in back of my grandparent[']s home . . . . I only entered the home one time my entire stay there in Harlingen.

So I believe Rudy & Leo killed my ex girlfriend [Loera] because they didn't want me to leave with the money. . . .

If the cops ask you about [Loera] please request a lawyer because they don't care whose life they turn upside down. I don't want any of this touching my son. So protect him always.

4

When appellant was initially interviewed by law enforcement, he stated that he was at the scene when the shooting occurred and identified the shooter as an individual by the moniker "Monkey." Later, in a second interview with law enforcement, appellant admitted he shot Garcia but maintained it was in self-defense. Appellant moved to have the second interview suppressed prior to trial, which the trial court denied.

The second interview was admitted into evidence, and the entire video was played for the jury. Relevant here, appellant told officers that, just prior to the shooting, he learned that Rivera, his girlfriend, was sleeping with someone else. He said this made him angry, "but [he] didn't take it out on her," and instead, "it made the situation between [him] and [Garcia] up-score just a little bit to whether [he] didn't care if [Garcia] had a gun or not." He also stated that right before the shooting he was on withdrawal from "ice," which "amplif[ied]" his emotions.

In addition, appellant made incriminating statements about Loera's murder. When officers informed him that Loera was missing, appellant stated that he did not know where she was. He maintained that he was "the victim of some [expletive] shit." He stated that his cousins were plotting against him and stealing his inheritance money from him, and that if Loera was dead, she was probably murdered by his cousins to keep him in Harlingen because appellant previously planned to move away with her. He stated that if his cousins killed Loera, he was certain they would have buried her body in a hill behind his grandparent's house. He also stated that he hated Loera now because she walked out on him, and if he ever saw her again, he would "probably beat her up." Later, the officers informed appellant of evidence connecting him to Loera's murder, including a

5

photo of Loera's remains in a blanket recovered from appellant's phone, which appellant denied taking himself and insisted the image had been sent to him.

The jury convicted appellant of both counts. Appellant's convictions were enhanced due to two prior felony convictions, and the jury assessed punishment at seventy-five years' imprisonment as to Count I and twenty years' imprisonment as to Count II. The trial court sentenced appellant in accordance with the jury's verdict and ordered his sentences to run concurrently. This appeal followed.

## II.    MOTION TO SUPPRESS

By his first issue, appellant argues that the trial court erred when it denied his motion to suppress his second statement to law enforcement because "[i]t was unlawful for law enforcement to initiate the interrogation when they knew [he] had counsel," and he did not waive his right to counsel during the interview.

### A.    Standard of Review and Applicable Law

"We review a trial court's ruling on a motion to suppress under a bifurcated standard." *State v. Arellano*, 600 S.W.3d 53, 57 (Tex. Crim. App. 2020) (citing *Weems v. State*, 493 S.W.3d 574, 577 (Tex. Crim. App. 2016)). "We afford almost total deference to a trial court's findings of historical fact and determinations of mixed questions of law and fact that turn on credibility and demeanor if they are reasonably supported by the record." *Id*. (citing *Sims v. State*, 569 S.W.3d 634, 640 (Tex. Crim. App. 2019)). We review de novo the trial court's determination of legal questions and its application of the law to facts that do not turn upon a determination of witness credibility and demeanor. *Id.* The trial court's ruling will be sustained if it is correct on any applicable legal theory and the record reasonably supports it. *State v. Ruiz*, 581 S.W.3d 782, 785 (Tex. Crim. App. 2019).

6

The Sixth Amendment guarantees a defendant the right to have counsel present at all critical stages of criminal proceedings once the adversary process has been initiated. *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009) (citing *United States v. Wade*, 388 U.S. 218, 227–28 (1967)). Interrogation by the State is a critical stage of criminal proceedings. *Id.* To invoke his right to counsel, the defendant "'must unambiguously request counsel' during a custodial interrogation; thus, 'he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'" *Pecina v. State*, 361 S.W.3d 68, 79 (Tex. Crim. App. 2012) (quoting *Davis v. United States*, 512 U.S. 452, 459 (1994)). "We view the totality of circumstances from the viewpoint of the objectively reasonable police officer conducting custodial interrogation." *Id.*

The Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent. *Montejo*, 556 U.S. at 786. "The defendant may waive the right whether or not he is already represented by counsel; the decision to waive need not itself be counseled." *Id.* "[W]hen a defendant is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically does the trick." *Id.*

**B.    Analysis**

Appellant first argues that his second interview with law enforcement should have been suppressed because the officers knew that he had a lawyer, and it was therefore "unlawful for law enforcement to initiate the [second] interrogation." He contends that "[o]nce the accused has invoked his right to counsel," "he is not subject to further interrogation until counsel has been made available." (Citing *Edwards v Arizona*, 451 U.S.

7

477 (1980)). Despite appellant's contention, the United States Supreme Court has specifically rejected the notion that a represented defendant can never be approached by the State and asked to consent to interrogation. *See Montejo*, 556 U.S. at 789. "What matters for *Miranda* and *Edwards* is what happens when the defendant is approached for interrogation, and (if he consents) what happens during the interrogation—not what happened at any preliminary hearing." *Id.* at 797.

Appellant next argues that he invoked his right to counsel at the beginning of the interview and before he was read his *Miranda* rights, and therefore, the officers violated his Sixth Amendment rights when they continued the interrogation. We note that appellant does not challenge the adequacy of the *Miranda* rights that were administered to him. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22 § 3(e)(2). Nor does appellant argue that he invoked his right to counsel after he was read his *Miranda* rights.

Appellant was interviewed by Harlingen Police Department Detective Joel Yanes[1] and Officer Tony Rocha. After some pleasantries, Yanes asked appellant if he was willing to talk to him about the case, and appellant responded, "Yeah, to some extent." Appellant then replied that he "went over the situation with" his lawyers and "everything points to . . . a little bit of self-defense on this matter." Then the following exchanged occurred[2]:

Yanes: [I]'d like to go over it all again with you. . . . If you're willing to talk to us about it, you know, pretty . . . free and clear, we'll get into it again and take it all that into account. Okay?

Appellant: Hm. . . My attorneys did tell me that . . . they wanted to be present for this type of shit here, man, but hm . . .

Rocha: What do you want?

---

[1] Detective Joel Yanes's name also appears as Yanez in the record.

[2] The quoted portions of the interview are taken from an admitted transcript of the interview.

8

Appellant:    There's nothing to hide. You know what I mean? There's . . . .

Yanes:        Yeah.

Appellant:    You know? I mean if you guys are here to . . . help me? Obviously, I don't think [so].

Yanes:        Well, I mean, that goes kind of hand and hand with the investigation. . . . [W]e're the fact finders in the case.

Appellant:    Mm-hmm.

Yanes:        Hm. . . [g]ood or bad. So I'm not going to be like: "Well, I'm not going to mention this because it's going to benefit Tony. I'm only going to mention this and this and this . . . (unintelligible)."

Appellant:    Right. Well, you need to talk to me too. If we're going to talk like men, and we're going to talk about what the [expletive] happened that night, . . .

Yanes:        Mm-hmm.

Appellant:    . . . then I'm all for it.

Later, Yanes explained that he is required to read appellant his *Miranda* rights, and appellant responded:

Appellant:    But I rather talk to you then get the [expletive] . . . wonder what's going on. You know?

Yanes:        Exactly, and . . . legally in order for us to talk to you since you're in custody, we have to make sure that you're aware of your . . . *Miranda* Rights before we do.

Appellant:    I am. I am.

Yanes:        Now, at that point, if you . . . still wish to continue with us, great. If you don't want to, well, that's . . . your right as well.

Appellant:    I can't—Right—'cause my attorneys told me not to. You know what I mean?

Yanes:        Well, I mean, it's . . .

Appellant:    I'll be slapping them in the face.

Yanes: Well, if it's . . . [i]t's your decision ultimately, you know. What I can do is I can go over them with you and then that's going to be your . . . decision to make, Man.

Appellant: Está bueno. [Alright.][3]

Yanes then explained to appellant that there's no such thing as an official or unofficial statement to police and reiterated that it is up to appellant whether he wants his attorney with him during the interrogation. Appellant was then read all five *Miranda* warnings, which he signed and indicated he understood.

In the trial court's order denying appellant's motion to suppress, it found that appellant "never asked to speak with appointed counsel" and waived his right to have counsel present. We agree. The above exchange illustrates that appellant never requested counsel, and in fact, shows that appellant indicated multiple times that he wanted to discuss the case with Yanes and Rocha. Thus, appellant did not "unambiguously request counsel" at any point before he was administered his *Miranda* rights. *See Pecina*, 361 S.W.3d at 79.

Appellant contends that his "statements about 'I can't' and 'my attorney would not like me talking' indicate that" he did not waive "his rights to counsel and his right to remain silent." Despite his contentions, these statements were insufficient to invoke his right to counsel because he never explicitly made a request for his attorney. *See Pecina*, 361 S.W.3d at 79; *see, e.g.*, *Davis v. State*, 313 S.W.3d 317, 340–41 (Tex. Crim. App. 2010) (holding that the appellant's declaration, "I should have a lawyer," was an ambiguous request for counsel because "appellant's statement was not in the form of a request nor did appellant expressly say that he wanted a lawyer").

---

[3] Appellant's response was translated into English in the transcript of the interview.

10

We conclude that appellant never invoked his right to counsel, and therefore, his subsequent waiver of his *Miranda* rights is not presumptively involuntary, and the trial court did not err when it denied appellant's motion to suppress. *See Montejo*, 556 U.S. at 786; *Pecina*, 361 S.W.3d at 79. We overrule appellant's first issue.

### III.  MULTIPLE ASSAILANTS INSTRUCTION

Appellant next argues that the trial court committed reversible error when it denied his request for an instruction on self-defense against multiple assailants.

### A.  Standard of Review and Applicable Law

"We review jury charge error under a two-pronged test." *Cyr v. State*, 665 S.W.3d 551, 556 (Tex. Crim. App. 2022). First, we look to whether the charge is erroneous; then we ask whether the appellant was harmed by the error. *Id.* Where there is a timely objection to the charge, as in this case, the appellant must show he suffered "some harm." *Id.* (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)).

"Regardless of the strength or credibility of the evidence, a defendant is entitled to an instruction on any defensive issue that is raised by the evidence." *Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020). "Raised by the evidence" means "there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that that element is true." *Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007). We review a trial court's denial of a defensive instruction for an abuse of discretion, and in doing so, we view the evidence in the light most favorable to the defendant's requested submission. *Chase v. State*, 666 S.W.3d 832, 834 (Tex. App.—Tyler 2023, pet. ref'd); *Jordan*, 593 S.W.3d at 343.

"When the evidence viewed from the defendant's standpoint shows an attack or threatened attack by more than one assailant, the defendant is entitled to a multiple assailants instruction." *Jordan*, 593 S.W.3d at 343. "The issue may be raised even as to those who are not themselves aggressors as long as they seem to be in any way encouraging, aiding, or advising the aggressor." *Id.* "'[M]ultiple assailants' does not require evidence that each person defended against was an aggressor in his own right; it requires evidence that the defendant had a reasonable fear of serious bodily injury from a group of people acting together." *Id.* at 344.

## B. Analysis

Appellant argues that he was entitled to a multiple assailants instruction[4] because (1) the evidence indicated that he was assaulted by Garcia "and another person name[d] Richard Carr" the week prior to the shooting, (2) some testimony by Vargas suggested that Garcia went to the residence to confront appellant, and (3) Vargas had a backpack when appellant arrived, which one witness suggested could have contained a gun.[5]

Assuming without deciding that the trial court erred in denying the multiple assailants instruction, we hold that any error was harmless. Here, the jury was instructed on the law of self-defense and using deadly force against another. Appellant advanced a theory at trial that deadly force was immediately necessary to defend himself against Garcia's use or attempted use of unlawful force because Garcia was allegedly waiting to ambush him, assaulted him the week before the shooting, and was hiding or intending to use a gun. *See* Tex. Penal Code Ann. § 9.32(a). However, the jury rejected appellant's

---

[4] Appellant did not propose any specific language for the multiple assailants instruction at trial.

[5] Vargas maintained at trial that he did not have a gun, and the backpack only had drug paraphernalia inside.

theory of self-defense and the notion that he had a reasonable belief that Garcia was attempting to use unlawful force against him. *See id.*

There was even less evidence that appellant reasonably believed he was under attack from Garcia's passenger, Vargas. There was no evidence as to how appellant perceived Vargas to be a threat besides being in Garcia's vehicle. Evidence at trial established that appellant did not know Vargas, there was no evidence that Vargas had previously assaulted or attempted to assault appellant, and no evidence that Vargas had acted threatening towards appellant. There was also no evidence that Garcia and Vargas colluded together to kill appellant.

Given the jury's rejection of appellant's self-defense theory against Garcia, and the lack of evidence as to how Vargas constituted a threat to appellant, appellant failed to meet his burden of proving that he suffered some harm by the trial court's failure to give the multiple assailants charge. *See Dickey v. State*, 22 S.W.3d 490, 492–93 (Tex. Crim. App. 1999) (finding that because jury rejected appellant's self-defense instruction and nothing indicated collusion between the deceased and his companion, appellant "failed to meet his burden of proving he suffered some actual harm by the trial court's failure to give the multiple assailants charge"); *Echavarria v. State*, 362 S.W.3d 148, 153 (Tex. App.—San Antonio 2011, pet. ref'd); *see also Weekley v. State*, No. 01-18-00543-CR, 2020 WL 237932, at *9 (Tex. App.—Houston [1st Dist.] Jan. 16, 2020, no pet.) (mem. op., not designated for publication) ("Given the jury's implicit rejection of Weekley's self-defense theory against Franco . . . it would make no sense to conclude that the jury could have found that the three others were, as Weekley's requested instruction stated, 'present

13

for the purpose and acting together to take [Weekley's] life or to do [her] serious bodily injury.'").

We conclude that even if the trial court erred when it denied his request for an instruction on self-defense against multiple assailants, appellant failed to establish that he suffered "some harm." *See Dickey*, 22 S.W.3d at 492–93; *Echavarria*, 362 S.W.3d at 153; *see also Weekley*, 2020 WL 237932, at *9. Nothing in the record suggests that the jury would have delivered a different verdict had it received a multiple-assailant self-defense instruction. We overrule appellant's second issue.

## IV. PENDING MURDER CHARGES

By his last issue, appellant argues the trial court erred when it admitted evidence of his pending murder indictment during the State's case in chief. He argues that admission of the evidence violated Texas Rules of Evidence 403 and 404(b).

### A. Standard of Review and Applicable Law

Under Rule 404, evidence of other crimes, wrongs, or acts is not admissible "to prove the character of a person in order to show action in conformity therewith," but extraneous offense evidence may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." TEX. R. EVID. 404(a), (b). Rebuttal of a defensive theory is one of the "other purposes" for which extraneous-offense evidence may be admitted under the Rule. *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009); *Moses v. State*, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003). "By raising a defensive theory, the defendant 'opens the door' for the State to offer rebuttal testimony regarding an extraneous offense if the extraneous offense has characteristics common with the offense for which the

14

defendant was on trial." *Knight v. State*, 457 S.W.3d 192, 202 (Tex. App.—El Paso 2015, pet. ref'd).

However, even when the admission of extraneous offense evidence is permissible under Rule 404(b), admission of the offense may violate Rule 403 if the probative value of the offense is substantially outweighed by the danger of unfair prejudice. *McGregor v. State*, 394 S.W.3d 90, 120 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd).

> We consider the following factors when conducting a Rule 403 analysis: (1) the strength of the extraneous offense evidence to make a fact of consequence more or less probable; (2) the potential of the extraneous offense to impress the jury in some irrational but indelible way; (3) the time during trial that the State requires to develop evidence of the extraneous misconduct; and (4) the need by the State for the extraneous evidence.

*Id.*

A trial court's decision to exclude evidence is reviewed for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). "We uphold the trial court's ruling on a Rule 403 balancing test, whether explicit or implied, if it is within the zone of reasonable disagreement." *McGregor*, 394 S.W.3d at 120; *see Valadez v. State*, 663 S.W.3d 133, 143 (Tex. Crim. App. 2022).

## B. Analysis

Appellant argues that the trial court violated Rule 404(b) when it allowed the State to admit evidence of the pending charge against him for the murder of Loera. *See* TEX. R. EVID. 404(b). However, the second pending murder charge constituted an extraneous offense or prior violent bad act and was introduced to rebut his self-defense theory. Appellant contends that this evidence was introduced "before any self-defense related testimony was introduced." But by the time the second interview came into evidence, the State had already introduced appellant's letters which included evidence of self-defense

15

and mentions of Loera's murder. Therefore, the evidence was admissible under Rule 404(b). *See Williams*, 301 S.W.3d at 687; *Knight*, 457 S.W.3d at 202.

Appellant next argues that the trial court erred in admitting evidence of his second pending murder charge because the evidence was more prejudicial than probative. *See* TEX. R. EVID. 403. He argues that "the prejudicial effect of having the jury hear evidence of a second pending murder charge[]" inherently "outweighs the probative value under the balancing test that the court must hold under Rule 403."

We disagree. Here, evidence of the pending murder charge was used to rebut appellant's defensive theory that he was in fear of his life because Garcia was planning to attack him. Just as appellant maintained that he was Garcia's intended victim, appellant maintained that he was a victim of his cousins' plot to steal his money, and Loera was caught up in their ploy. Further, when the extraneous offense is "no more heinous" than the charged offense, it is "not likely to create such a prejudice in the minds of the jury that it would have been unable to limit its consideration of the evidence to its proper purpose." *Taylor v. State*, 920 S.W.2d 319, 323 (Tex. Crim. App. 1996).

Even assuming admission of the extraneous offense was erroneous, appellant made several statements that contradicted his self-defense theory. In his own words, appellant wrote multiple times that Garcia appeared "laid back" during their encounter, and just prior to the shooting, appellant told officers that he was angry and on withdrawal from cocaine, which "up-score[d]" his confrontation with Garcia. Moreover, appellant had a prior attempted murder conviction, which was included in Count II of the indictment and

jury charge,[6] and the jury heard evidence that appellant, while in custody, told a Cameron County jailer that he knew the jailer was from Harlingen, and he "was going find [him] and shoot [him]."

In light of these facts, we hold that the trial court did not abuse its discretion in concluding that the danger of unfair prejudice did not substantially outweigh the probative value of this evidence. And even if the trial court did err, the admission of the extraneous offense evidence was harmless. We overrule appellant's third issue.[7]

## V. CONCLUSION

The trial court's judgment is affirmed.

JON WEST
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
9th day of October, 2025.

---

[6] Count II of the charge alleged that appellant, having been previously convicted of the felony offense of attempted murder, intentionally and knowingly possessed a firearm "before the fifth anniversary of [his] release from confinement following conviction of the felony."

[7] By a sub-issue to his last issue, appellant argues that the trial court erred in admitting the extraneous offense evidence because no Rule 104 or 403 hearing was held before the evidence was introduced. See TEX. R. EVID. 104(c), 403. However, neither hearing is required before the admittance of such evidence. See Rawlins v. State, 521 S.W.3d 863, 868 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd); Patterson v. State, 496 S.W.3d 919, 929 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd). Moreover, appellant never objected to the extraneous offense evidence under Rule 104, and thus waived his complaint on that alleged error. See TEX. R. APP. P. 33.1(a); Rawlins, 521 S.W.3d at 868.