In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-20-00083-CR**
_____

**MARQUIS DESHAWN CLARK JR., Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 221st District Court**
**Montgomery County, Texas**
**Trial Cause No. 18-09-12648-CR**

**MEMORANDUM OPINION**

A grand jury indicted Appellant Marquis Deshawn Clark Jr. for aggravated robbery by using and exhibiting a deadly weapon, namely a firearm. *See* Tex. Penal Code Ann. § 29.03(a)(2). Clark pleaded "not guilty," but a jury found him guilty of the offense charged and assessed punishment at imprisonment for life. Clark appeals his conviction, raising six issues. Finding no reversible error, we affirm.

1

Evidence at Trial

Testimony of Law Enforcement Officers

Corey Cooke, a deputy with the Montgomery County Sheriff's Office testified that he responded to a call at about 2:45 a.m. on August 23, 2018, for an aggravated robbery at a Circle K convenience store in Porter, Texas. Cooke testified that the surveillance video showed that the suspects arrived in a black Dodge Ram truck and left in the same vehicle. According to Cooke, four men arrived in the truck and entered the store, and two of the men had handguns. The suspects held a man in the parking lot at gunpoint and forced the man into the store, one suspect jumped over the counter and put a gun in the cashier's face, took $50 from the register, about ten packs of cigarettes, and two cell phones. One of the suspects was not wearing a mask and he was later identified as Lacharles Craige and as the man who put a gun in the cashier's face.

The surveillance video from the Circle K was admitted into evidence and published to the jury. Cooke identified Trenton Jackson and Lacharles Craige in the video. Cooke also identified a third suspect wearing all black, a mask, and red gloves, and a fourth suspect wearing a University of Houston hoodie and mask. Craige had a black and silver semi-automatic handgun, Jackson also had a pistol pointed at the cashier, and the third suspect who was wearing the red gloves had a black semi-automatic handgun. According to Cooke, the suspects also held two

people in the parking lot at gunpoint and stole their cell phones so they could not notify law enforcement. Cooke characterized the robbery as "extremely violent and extremely reckless[.]"

The following day, Cooke learned of a robbery at an adult bookstore in Houston that was also committed by four men about thirty minutes after the robbery at the Circle K. Cooke contacted Detective Nealy with the Houston Police Department who provided a photograph of one of the suspects from the adult bookstore robbery and that photograph was of Craige. Craige was the only suspect in the Circle K robbery who was not wearing a mask. Cooke learned that Nealy had already interviewed Craige, and Craige had admitted to the Circle K robbery. Cooke testified that he spoke with a victim whom the suspects pulled into the store from the parking lot, and the victim recalled that someone held a pistol to the back of his head. On cross-examination Cooke testified that Lacharles Craige and the third suspect, who wore red gloves, held guns to the victims' heads. Cooke agreed that the third suspect seemed to be a "lookout" for a while and then he went behind the counter.

Detective Brad Curtis, with the homicide and violent crimes unit of the Montgomery County Sheriff's Office, testified that he was assigned to the Circle K robbery that occurred on August 23, 2018, in Porter. He had reviewed videos of the Circle K robbery and of the robbery committed about thirty minutes later. Curtis

agreed he verified that four people were involved in both robberies. According to Curtis, the deputies who responded to the robbery quickly learned of another similar crime that occurred not far away that seemed to involve the same vehicle and people. Curtis testified that the responding deputies at the Circle K identified that a Dodge pickup truck was involved in the Circle K store robbery, and later a wrecked Dodge pickup truck was located at the scene of the second robbery. Curtis identified certain exhibits as photos of Clark, Craige, Jackson, and Cameron Lucas. Curtis agreed that Craige had entered a guilty plea and received a fifty-year sentence, Jackson pleaded guilty and received a forty-year sentence, and Lucas pleaded guilty and received a thirty-year sentence—all for their involvement in the Circle K robbery. On cross-examination, Curtis agreed that based solely on the video from the Circle K, he could not say that Clark was in the store that night.

Officer Bobby Carlyle, with the Houston Police Department, testified that on August 23, 2018, he responded to a "hold-up panic alarm" from an adult bookstore. Carlyle testified that when he arrived and entered the store, he encountered a man wearing a hoodie and a mask who was holding a gun, and the man ran toward the back of the store where he got into a black four-door sedan and drove to the front of the store. When Carlyle's backup arrived, the officers pursued the vehicle south toward Houston, they lost the vehicle for a while, but other police units caught the vehicle when it crashed. According to Carlyle, the police matched one of the suspects

4

to video from the store's surveillance cameras. Carlyle also testified that he talked with the store's cashier shortly after the robbery, and she told them, "they [] made her…get naked and then made her perform oral sex on [two] of them."

Officer Joshua Vincent, with the Houston Police Department, testified that on the night of August 23, 2018, dispatch put out a priority call for service on a hold-up panic alarm at an adult bookstore. Before he could get to the location, he heard over the radio that the suspects' vehicle had crashed, and the suspects were running on foot. He and his superior officer stopped the vehicle to help set up a perimeter, and a Black male who was bloody and sweaty approached the vehicle and said he was in a crash and was hurt. Vincent testified that he later identified the man as Lacharles Craige.

Special Agent Curtis Williams, with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), testified that he is a digital media collections specialist trained to extract information stored on electronic devices, including from cell phones. Williams agreed he was contacted by another special agent to complete a "cell phone dump" in this case pursuant to a warrant, and he identified Clark's cell phone, which was admitted into evidence. He was unable to unlock the cell phone, but ATF was able to extract information from the phone and store it on two USB drives, and Williams generated a report on the phone's contents, which was admitted into evidence.

5

Special Agent Dominic Rosamilia, a special agent with ATF assigned to violent crimes, testified that he was brought into this case by a Houston Police Department robbery task force officer. According to Rosamilia, ATF became involved because the crimes were in two jurisdictions and initial investigation discovered that robberies had been committed in three counties. Rosamilia testified that the suspects would use stolen vehicles and often wore the same clothing, including a skull mask. Rosamilia characterized the robberies as "a string of violence."

Rosamilia stated he served as a case manager, and he took over the search warrant for the phones. Rosamilia testified that he received a report of the "cell phone dump" of Clark's phone, and he examined the timeline of calls, messages, and pictures from the phone. According to Rosamilia, the timeline from Clark's cell phone showed no data, messages, or pictures during at least a two-hour window on the dates of the robberies except for one Facetime call. Based on his experience and training, this indicated the cell phone user was likely turning the phone off during that window, and he was unable to identify the phone's location from pings off cell towers during that window. Rosamilia testified that the report from Clark's phone showed more than twenty Google searches between August 27 and September 4 for news updates on robbery, update on adult bookstore robbery, "adult bookstore employee raped in takeover robbery[,]" and suspects caught after sexual assault.

6

Rosamilia also testified that in the days prior to August 24, 2018, the report showed searches for "Shipley Donuts robbery[,]" a drive-through robbery at McDonald's, and robberies in northwest Houston. According to Rosamilia, one message from the phone dated August 23, 2018 stated "I lost my stuff on the lick last night[.]" Rosamilia testified that he identified other messages from the phone dated August 29 indicating that people were "snitching" or "telling[]" and at that time, arrests had been made in the robbery. Rosamilia also identified a message from the phone identifying the sender as "Marquis." Rosamilia also identified a photo from the phone that depicted Clark with a semi-automatic firearm with an extended magazine that holds thirty rounds of ammunition, and he agreed that a gun similar to this had been used in at least one of the robberies in this case.

Detective Jeremy Curtis, with the Houston Police Department, testified that he is assigned to the robbery division, violent offender task force, and the ATF crime strike force in Houston. Curtis agreed that, with the assistance of ATF, he was able to link numerous aggravated robberies that took place in and around Houston based on common factors, including the clothing and faces of the individuals involved in the series of robberies, their guns, and their propensity for violence with firearms. He agreed that there were instances where robberies were committed "within minutes of each other [and] [i]n close proximity to each other[.]" Curtis testified that he and Detective Nealy interviewed Lacharles Craige after he was caught fleeing

from the adult bookstore robbery. According to Curtis, after interviewing Craige, Trenton Jackson, Cameron Lucas, and Marquis Clark were identified as suspects. Curtis testified that a warrant for Clark's arrest was obtained, he was apprehended with the assistance of the SWAT team, and Curtis interviewed Clark when he was in police custody. Curtis agreed that in interviewing Cameron Lucas and Trenton Jackson, he learned some corroborating information about the numerous aggravated robberies that were committed by them and by Clark. A video exhibit of Curtis's interview with Clark was admitted into evidence.

Detective Ken Nealy, with the Houston Police Department, testified that he was a task force officer assigned to ATF. Nealy testified that when he is involved in investigating "crews," he looks "at those as individuals, at least two to three people, that have the same common goal, that sometimes they are organized and sometimes unorganized. But the purpose and the design [of the crew] is to go in and commit a robbery or aggravated robbery." Nealy also testified that suspects will often use a stolen car when committing a crime and abandon it after committing the crime. Nealy agreed on cross-examination that no DNA evidence linked Clark to the robberies at the Circle K or the adult bookstore.

Nealy testified that he responded to the robbery at the adult bookstore on August 23, 2018. Upon arrival at the scene, he saw a truck parked in front of the business and a wrecked Toyota Corolla that had been returned to the store by a tow

8

truck. Nealy testified that he entered the store, found it "in total disarray," and spoke with the security guard, who told him he had been forced to the ground, had a gun held on him, and had his weapon taken. Nealy also testified that he spoke to the store clerk, who reported that the suspects "basically took over[]" when they entered the store, held a gun to her head, and forced her to perform oral sex on two of the suspects. According to Nealy, the store clerk had triggered the hold-up alarm during a time when the men left her alone in a back room. Nealy testified that the store clerk made an identification from photo spreads that was corroborated by the similarity of other cases, with what he observed from surveillance video, by the gloves and skull mask worn by Clark at the numerous robberies, and from what Craige, Jackson, and Lucas told him. Nealy also testified that the surveillance video from the adult bookstore was "[p]robably the best ever[]" that he had seen because it was clear and digital.

Nealy testified that he interviewed Lacharles Craige, who was the first suspect to be arrested. According to Nealy, Craige provided Trenton Jackson's name, and after Nealy matched a photo of Jackson from a law enforcement database to the video from the store, an arrest warrant for Jackson issued. Nealy testified that the investigation expanded based on statements from Craige and Jackson, and after receiving a call from a Detective Curtis in Montgomery County about the Circle K robbery, they determined that the vehicle the suspects used in Montgomery County

9

was the same one the suspects drove to the adult bookstore. According to Nealy, he was able to "reconcile the video[s]" from both the Circle K and the adult bookstore, both of which depicted the same crew, including Clark, wearing the same clothes, behaving in the same manner, and displaying the same make and model firearms. Nealy agreed that this group of defendants also "had a very keen affinity for Newport cigarettes[.]"

Nealy agreed that he and Detective Curtis, along with the prosecutor, interviewed Cameron Lucas in prison, who was forthcoming with information that linked Clark to the Circle K and adult bookstore robberies. Nealy testified that after reviewing video footage of robberies at a Denny's off of FM 1960 and McDonald's on FM 1960, robberies in Sugar Land and Missouri City, and at the Shipley's Donut store, he noted "they were very similar in the fact that they would basically do a takeover. They would actually enter the business swiftly armed. They would produce weapons and actually make demands of the people inside that were in the business." After "putting the pieces of the puzzle together[,]" an arrest warrant for Clark was obtained. Nealy testified that Clark was arrested with the assistance of undercover officers. Nealy also testified that in a search of Clark's residence,[1] officers found a long-sleeved black hoodie that resembled what Nealy had observed on surveillance

---

[1] The search of the residence was conducted pursuant to consent by the owner, who was Clark's stepfather, and Clark also signed a consent to search his room.

videos of the Circle K and the adult bookstore. Nealy stated that a detective who specializes in social media had located Clark's social media accounts, and she identified a picture posted by Clark about a wreck he had been in that was posted on August 26, 2018. Nealy also stated that information from Clark's cell phone supported the fact that Clark was involved in the Circle K robbery including Google searches and text messages. Nealy verified that the cell phone obtained was Clark's by having Clark use his fingerprint to unlock it. According to Nealy, Clark consistently denied his involvement. Nealy agreed that a backpack found in the Dodge truck that was left at the adult bookstore contained Clark's Texas ID card, a pair of "working hands gloves[,]" and six unopened packages of Newport cigarettes. Nealy also agreed that two cartons of Newport cigarettes were recovered from the Dodge truck. On cross-examination, Nealy agreed that the store clerk at the adult bookstore had stated there was a mole on Clark's genitals, but Nealy was unable to identify any distinguishing marks on Clark in a photograph taken after Clark was arrested.

The State also called eleven additional law enforcement officers from the Harris County Sheriff's Office, the Houston Police Department, the Pasadena Police Department, the Missouri City Police Department, and the Sugar Land Police Department to testify. The officers testified about their involvement investigating the following takeover-style robberies: America's Inn on July 12, 2018; Shipley's

11

Donuts on July 16, 2018; Subway restaurant on July 20, 2018; Shipley's Donuts on July 23, 2018; Denny's on August 8, 2018; McDonald's on August 12, 2018; Stripes gas station and McDonald's on August 14, 2018; and Pappa's Son donut shop and Timewise gas station on August 18, 2018.

Testimony of Victims[2]

Tom testified that he and his fiancé Allie stopped at the Circle K store one night, and there was a four-door Dodge vehicle with all doors open in the parking lot. Tom testified that a person wearing black clothes, red gloves, and a red bandana on his face approached their vehicle and demanded that they give him their phones. Timothy and his fiancé went home and called 911 to report the incident. Timothy was unable to identify anyone in the courtroom as the person who took their phones.

Allie testified that on August 23, 2018, Tom picked her up after her work shift ended in the early morning hours, and they stopped at a store to get something to drink. According to Allie, a man with a gun approached their car and asked for their phones, and they complied. Allie testified that the man wore all black, red gloves, and had a red bandana covering his face. Allie testified that the police arrived within a few minutes, and she gave a statement to the police.

---

[2] We use pseudonyms to refer to the alleged victims. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process[]").

Donald testified that he was working the night shift by himself at the Circle K on the day of the robbery. The surveillance video from the store was admitted into evidence and published to the jury. Donald testified that he saw a black Dodge truck circling around the parking lot before the robbery occurred. According to Donald, when the men first entered the store, one man jumped over the counter, knocked over cigarettes, and opened the register. Donald testified that two other men walked behind the counter, and one put a gun to his head and told him to open the safe. Donald testified that he was present in court when Craige pleaded guilty to the robbery, and he recognized Craige as the man who told him to open the register. In reviewing the surveillance video from the store, Donald identified a man wearing red gloves who told him to open the safe. Donald agreed that at one point, the man wearing red gloves tried to open the safe. Donald also agreed that during the robbery, a customer who was getting gasoline entered the store, and the man in the red gloves said, "shoot him and let's go[.]"

Donald testified that the store's property loss report showed a loss of $172 from the cash box and 64 packs of Newport cigarettes valued at $441. After the men left the store, Donald called his wife and then called 911. On cross-examination, Donald agreed he originally told the police that five or six people were involved in the robbery, but in his estimation, it was "an honest mistake[.]" He agreed that two

13

of the men showed their faces and two did not, but he could tell that one man wearing a mask was Black because he could see the area around his eyes.

Nathaniel testified that he worked for a security company and on August 23, 2018, he was working the night shift at an adult bookstore in Houston. According to Nathaniel, at about 3 a.m., four Black men entered the store and held the cashier at gunpoint. A man wearing red gloves told him to lie on the floor, pointed a gun at him, kicked him, and took his gun, wallet, and cell phones. Nathaniel testified that when the men left, they took his car—a black Toyota Corolla—which they wrecked when the police followed them. Nathaniel recognized his vehicle in the photo admitted as Exhibit 2-A-1. Nathaniel agreed he watched surveillance video from the store the night of the robbery, which was admitted into evidence and published to the jury. He testified that the video showed four men enter the store, and two of the men had guns, including a man wearing red gloves.

Connie testified that she works at an adult bookstore on US 59, and she agreed that on August 23, 2018, the store was robbed in the early morning hours. According to Connie, she and the security guard were at the store at about 2 a.m. when the door opened, and she saw the reflection of a gun. Connie testified that four men came in, she saw that two of the men had guns, and one man asked her to take him to the money. Connie testified that she opened the register that held cash, some of the men disarmed the security guard, but she was unable to open the safe as the men asked.

14

According to Connie, when the men realized she "was no good to them," they threw her in the break room, she was held at gunpoint, a man who was not wearing a mask made her take off her clothes and perform oral sex on him, and then a man with a gun who was wearing red gloves also made her perform oral sex on him. Eventually Connie pressed the panic button in the break room. Connie testified that she heard the men say "laws[,]" which she understood as their cue to leave, the men left through the back door of the store, and after they had gone, she used the store phone to call the police. Connie testified that after the men left, she discovered her cell phone and backpack were gone as well as two or three hundred items from the store. Connie testified that she went to Ben Taub for a rape kit exam. According to Connie, she later identified Craige and Jackson to the police, and she was 80% certain of her identification of Clark to the police. She also told police that one of the men who sexually assaulted her had a mole on his genitals.

Amy testified that she was a department manager at a McDonald's where several men committed a robbery on August 8, 2018, while she was working. According to Amy, one of the men fired his gun inside the restaurant, and she hit one of the men on the head with a coffee pot.

Codefendants Craige, Lucas and Jackson

Lacharles Craige, Cameron Lucas, and Trenton Jackson were charged in Montgomery County for the aggravated robbery that occurred on or about August

15

23, 2018, and all three men entered guilty pleas, and judgments were entered for all three. Craige was sentenced to fifty years' imprisonment, Lucas was sentenced to thirty years, and Jackson was sentenced to forty years.

Jackson testified at Clark's trial and told the jury that on the night of August 23, 2018, he, Clark, Craige, and Lucas drove in a black truck to an area north of Houston. According to Jackson, the four men robbed a convenience store where Jackson took Newport cigarettes. Jackson testified that the four men entered the store, they laid the store clerk on the ground, Jackson grabbed Newport cigarettes, and then asked the clerk to open the safe. According to Jackson, they left in the truck, and after about twenty minutes, they stopped at another store where they held the security guard hostage and took his gun, phone, and credit cards, and they also took store merchandise and about two thousand dollars. Jackson identified himself, Clark, Craige, and Lucas in photos taken from the convenience store surveillance video and the adult bookstore surveillance video, and he agreed that Clark was the man pictured wearing red gloves. Jackson agreed the men left in the security guard's vehicle, which they wrecked when the police were chasing them. Jackson testified that Clark told him he had checked the internet to see if the robbery made the news.

Cameron Lucas testified that he was an inmate at the Gibb Lewis Unit, he had pleaded guilty to an aggravated robbery that occurred on or about August 23, 2018, and he had agreed to testify against Clark in exchange for certain charges not being

16

prosecuted against him. Lucas testified that he, Clark, Craige, and Jackson were together in a black truck on August 23, 2018, they planned to "hit a lick[,]" they had masks and gloves, they found a store that was open, but they did not get much money there. Lucas looked at photos from the store's surveillance video, and he identified himself wearing a hoodie and yellow gloves, Jackson with something pink over his face, and he identified Clark. Lucas testified that the clerk was unable to open the safe, and Lucas's role was to get Newport cigarettes and get money out of the register. Lucas testified that they decided to "hit another lick[]" because they did not get much money, and they went to another store within about an hour. Lucas identified Jackson, Craige, Clark, and himself in photos taken from the surveillance cameras at the second store, including Clark who was wearing red gloves. According to Lucas, they were supposed to get money and whatever they could sell from the store and then leave. According to Lucas, Clark made the cashier perform oral sex. Lucas testified that when a police officer entered the store at the front door, they left from the back door and took the security guard's car, leaving whatever they had taken from the other store in the black truck. Lucas recalled that, at some point, Clark asked Lucas where his phone and ID were, and they concluded he left his ID in the backpack in the truck. Lucas testified that, after a chase, they crashed, and when they split up, he jumped off the freeway.

Lucas testified that he saw on the news that Craige had been caught, and Lucas was caught about a week later after Craige informed on him. According to Lucas, Clark always used a skull mask when they robbed stores, and they always checked the internet after a robbery to see if the police had any leads. Lucas identified a skull mask as one that Clark had worn in a robbery at a McDonald's in Missouri City. Lucas testified that he did "licks" with the other men over a period of months in 2018 including: a McDonald's and a gas station in Missouri City about twenty minutes apart, a Cambodian donut shop, a Dollar Store, a 99 Cent store, an America's Inn, a Shipley's Donuts store, a Shell station, a McDonald's and a Subway in Pasadena, a McDonald's and Denny's in the FM 1960 area, a Stripes gas station and a McDonalds in Missouri City near US 59, and a Timewise Shell station in Sugar Land—although Lucas did not recall that Clark was involved in the robberies at the Shipley's Donuts or the Shell station. Lucas also identified a mask he stole from Academy and sold to Clark that Clark liked to wear during "licks[.]"

After the State rested, the defense did not call any witnesses. The jury charge included instructions on the law of parties, accomplice-witness testimony, and extraneous offense evidence.[3] The jury found Clark guilty as charged. After a hearing on punishment, the jury assessed punishment at life imprisonment. Clark timely appealed.

---

[3] Clark does not raise a challenge to the jury charge in this appeal.

Issues

Appellant raises the following issues on appeal:

1. Appellant was denied his constitutional due process right to be tried solely on the case for which he was indicted.
2. Appellant was denied his constitutional due process right to a fair trial by the Trial Court's failure to understand and apply the law applicable to his case.
3. The Trial court failed to conduct the probative v. prejudicial balancing test required by T.R.E. Rule 403.
4. The State's attorney failed in his constitutional and statutory duty to see solely that justice is done in putting inadmissible evidence before the jury.
5. Defense counsel was ineffective in failing to object to the extraneous offenses as being non-contextual.
6. Defense counsel was ineffective in failing to raise a T.R.E. Rule 404(b) objection to the extraneous offense evidence at guilt/innocence.

Each of Appellant's issues relates to the admission of evidence of extraneous offenses for which he was not indicted or prosecuted in this case.

Preservation of Error

In this case, the trial court initially allowed the State to introduce evidence of the aggravated robbery at the adult bookstore but required the State to omit facts about the alleged sexual assault. The court explained:

> I think you are able to talk about that there was another aggravated robbery and that he became a suspect, that's how they honed in on him, and the links to him in order to show that -- because I think the car at the other place and the car at the first place, I think that that to me is part and parcel of the first offense, our offense.

19

Defense counsel stated, "We are not going to object to that.…We are not going to make an objection at that point." In addition, the State put on testimony by law enforcement officers and by codefendants and other evidence of other aggravated robberies during its case in chief. Later during trial, the defense agreed to the admission of an alleged sexual assault at the adult bookstore because the defense believed the evidence included "exculpatory material[.]" Specifically, the victim of the sexual assault described one of her assailants as having a mole on his genitals.

To preserve error for appellate review, the record must show that the objection "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context[.]" Tex. R. App. P. 33.1(a)(1)(A). The point of error on appeal must comport with the objection made at trial. *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012) (citing *Thomas v. State*, 723 S.W.2d 696, 700 (Tex. Crim. App. 1986)). Therefore, even when a party fails to properly object to alleged constitutional errors at trial, the errors can be forfeited. *Id.* (citing *Briggs v. State*, 789 S.W.2d 918, 924 (Tex. Crim. App. 1990)).

In his first issue on appeal, Appellant argues that because of the admission of extraneous offense evidence—that is, other aggravated robberies—he was prosecuted for a "criminal episode" under sections 3.01 and 3.02 of the Penal Code, which denied him the "constitutional right to be tried solely for the offense for which

20

he was indicted." Appellant did not make these objections at trial, and there is nothing in the record that indicates the trial court or prosecutor knew that Appellant was making this or a similar due-process objection. Moreover, the jury charge does not reflect that the case was submitted to the jury as a "criminal episode" offense, but rather that the jury was asked to decide only the offense charged in the indictment. Appellant never put the court on notice of his alleged due-process complaint, nor did he argue to the trial court that he believed he was being denied a fair trial, and the issues Appellant raises on appeal were forfeited. *See Clark*, 365 S.W.3d at 339-40 (explaining that evidentiary objections at trial do not preserve a due process claim for appeal). In addition, Appellant cites no authority for his argument that the admission of the extraneous-offense evidence denied him due process. *See Vuong v. State*, 830 S.W.2d 929, 940 (Tex. Crim. App. 1992) (refusing to address an argument as inadequately briefed where appellant cited no constitutional provision, statutory authority, or case law in support of his claim). We overrule Appellant's first issue.

Appellant's fourth issue argues that the prosecutor "failed in his constitutional and statutory duty to see solely that justice is done" in putting inadmissible evidence before the jury. "Prosecutorial misconduct is generally an independent basis for objection that must be specifically urged [at trial] in order for error to be preserved." *Taylor v. State*, Nos. 09-16-00303-CR & 09-16-00307-CR, 2018 Tex. App. LEXIS

21

3426, at *16 (Tex. App.—Beaumont May 16, 2018, pet. ref'd) (mem. op., not designated for publication) (citing *Hajjar v. State*, 176 S.W.3d 554, 566 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd)). The proper method of preserving error for a claim of prosecutorial misconduct is to (1) object on specific grounds, (2) request an instruction that the factfinder disregard the comment, and (3) move for a mistrial. *See Joyner v. State*, 548 S.W.3d 731, 735 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd) (citing *Penry v. State*, 903 S.W.2d 715, 764 (Tex. Crim. App. 1995); *Hajjar*, 176 S.W.3d at 566).

We have examined the entire record and Appellant never made this objection, nor did he request an instruction that the factfinder disregard the comment, nor move for a mistrial on this basis. Appellant did not preserve the issue for appeal. *See* Tex. R. App. P. 33.1(a)(1); *Joyner*, 548 S.W.3d at 735-36; *Patterson v. State*, 496 S.W.3d 919, 929 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) ("Defense counsel did not assert that the State…engaged in prosecutorial misconduct. Thus, Patterson has not preserved any alleged prosecutorial misconduct issue for appellate review."); *Hajjar*, 176 S.W.3d at 566 (addressing prosecutorial misconduct argument and concluding: "By failing to object on this theory at trial, appellant has preserved nothing for our review."). Moreover, as we have already noted, Appellant did not object to the evidence of the robbery at the adult exotic store at trial. We overrule Appellant's fourth issue.

22

## Admission of Evidence

In his second issue on appeal, Appellant argues that he was "denied his constitutional due process right to a fair trial by the Trial Court's failure to understand and apply the law applicable to his case." Specifically, he argues that the trial court (1) "was not clear" on the standard for admission of same contextual transaction evidence versus extraneous offense evidence to prove identity under Rule 404(b) and (2) "confus[ed] evidence admissible for a [Penal Code] Chapter 3 'criminal episode' with the evidence admissible to prove the one indicted aggravated robbery." Appellant argues that the trial court's "failure to understand and apply the law applicable to his case[]" resulted in a denial of his constitutional due process right to a fair trial. Appellant failed to make this objection at trial. Moreover, we conclude that any error in the admission of evidence is generally non-constitutional error and subject to a harmless error analysis. *See* Tex. R. App. P. 44.2(b). Appellant complains that admission of evidence of five robberies in addition to the one for which Appellant was tried did not meet the standard for same contextual transaction evidence and that the second robbery at the adult bookstore was not needed to explain the Circle K robbery for which Appellant was indicted.

## Standard of Review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991)

23

(op. on reh'g). We will reverse a trial court's ruling only if it is outside the "zone of reasonable disagreement[.]" *Id.* "The erroneous admission of evidence is non-constitutional error." *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018) (citing *Taylor v. State*, 268 S.W.3d 571, 592 (Tex. Crim. App. 2008)). "Non-constitutional errors are harmful, and thus require reversal, only if they affect Appellant's substantial rights." *Id.* (citing Tex. R. App. P. 44.2(b)). The Court of Criminal Appeals has construed this to mean that "an error is reversible only when it has a substantial and injurious effect or influence in determin[ing] the jury's verdict." *Id.* (citing *Taylor*, 268 S.W.3d at 592). "If we have a fair assurance from an examination of the record as a whole that the error did not influence the jury, or had but a slight effect, we will not overturn the conviction." *Id.* If the trial court's evidentiary ruling is correct on any theory of law applicable to that ruling, it will not be disturbed even if the trial court gave the wrong reason for its correct ruling. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009) (citing *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002); *Sewell v. State*, 629 S.W.2d 42, 45 (Tex. Crim. App. 1982); *Shugart v. State*, 32 S.W.3d 355, 362 (Tex. App.—Waco 2000, pet. ref'd)).

Applicable Law

"Same transaction contextual evidence" is evidence that "imparts to the trier of fact information essential to understanding the context and circumstances of

24

events which, although legally separate offenses, are blended or interwoven." *Desormeaux v. State*, 362 S.W.3d 233, 238 (Tex. App.—Beaumont 2012, no pet.) (citing *Camacho v. State*, 864 S.W.2d 524, 532 (Tex. Crim. App. 1993); *Rogers v. State*, 853 S.W.2d 29, 33 (Tex. Crim. App. 1993)). Same transaction contextual evidence reflects the context in which a criminal act occurred and recognizes that events do not occur in a vacuum, and "a jury has a right to hear what occurred immediately before and after the offense in order to realistically evaluate the evidence." *McDonald v. State*, 148 S.W.3d 598, 601 (Tex. App.—Houston [14th Dist.] 2004), *aff'd,* 179 S.W.3d 571 (Tex. Crim. App. 2005) (citing *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000)).

To be admissible under Rule 404(b)—that is, relevant for a purpose other than to show character conformity—same transaction contextual evidence must be necessary to the jury's understanding of the offense. *Id.* at 601-02. Thus, necessity may be the "other purpose" for which the evidence is admissible under Rule 404(b). *Id.* at 602 (citing *Rogers*, 853 S.W.2d at 33). Necessity can exist either because: (1) several offenses are so intermixed or connected as to form a single, indivisible criminal transaction, such that in narrating the one, it is impracticable to avoid describing the other; or (2) the same transaction contextual evidence tends to establish some evidentiary fact, such as motive or intent. *Id.* In addition, upon a timely request, the State must give notice of its intent to introduce Rule 404(b) "other

25

purpose" extraneous offense evidence "other than that arising in the same transaction." *See* Tex. R. Evid. 404(b). Although necessity is required for same transaction contextual evidence to be relevant under Rule 404(b) for a purpose other than character conformity, there is no indication that it is required in order for same transaction contextual evidence to simply be evidence "arising in the same transaction" and thereby exempt from the Rule 404(b) notice rule. *Id.*

Although admissible under Rule 404(b), evidence may still be excluded under Rule 403 "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. "Rule 403 favors admissibility of relevant evidence, and the presumption is that relevant evidence will be more probative than prejudicial." *Montgomery*, 810 S.W.2d at 389; *Gittens v. State*, 560 S.W.3d 725, 732 (Tex. App.—San Antonio 2018, pet. ref'd). Once a trial court determines that extraneous offense evidence is admissible under Rule 404(b), the trial court must, upon proper objection by the opponent of the evidence, weigh the probative value of the evidence against its potential for unfair prejudice. *Id.*; *see* Tex. R. Evid. 403.

> [W]hen undertaking a Rule 403 analysis, [the trial court] must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a

26

jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006); *see also*

*Erazo v. State*, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004). Once a Rule 403 objection as to prejudice versus probative value is invoked, the trial court has no discretion whether to engage in the balancing test required by that rule. *Williams v. State*, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997). However, the trial court is not required to place any findings it makes or conclusions it draws on the record when engaging in the balancing test, and the trial court is presumed to engage in the required balancing test once Rule 403 has been invoked. *Id.*

In this case, the trial court conducted a pretrial hearing on the admissibility of evidence of the robbery at the adult bookstore. The State argued that evidence of the adult bookstore robbery was admissible as same transaction contextual evidence, and the defense agreed that was the legal theory before the court. The court heard evidence that the robbery at the adult bookstore occurred about thirty minutes after the Circle K robbery, and that Clark was ultimately identified based on evidence that the same black truck was identified at both scenes, the suspects wore the same kind of clothing, both were "takeover" style robberies, Clark's Texas-issued ID card was found in the bag inside the truck found at the second robbery, and a "significant amount" of cigarettes taken from the Circle K were found in the abandoned black

27

truck at the adult bookstore. Clark's trial counsel agreed that the ID card found at the adult bookstore identified Clark.

Later, during the trial, the court stated that identity had been placed at issue, the defense agreed, and the court further stated that under Rule 404(b), evidence of other bad acts was admissible and "that second one on the same day within the 20 or 30 minutes could lend some relevance on the issue of identity." The defense objected that only evidence of similar bad acts would be admissible and requested the court to limit the evidence to what was relevant to a common scheme or plan. The court agreed that because there were so many other bad acts, it would limit the State to evidence of the "takeover robberies[]" that happened very close in time to the charged offense and that involved the codefendants. Clark's trial counsel told the court that, after having spoken with Clark, the defense agreed to admission of evidence of the robbery at the adult bookstore because "we believe there is exculpatory material that can be provided to the jury[]" and that Clark was "in agreement with that." The State told the court that it had agreed with Clark's trial counsel not to bring in evidence of a sexual assault by Clark and Craige that occurred about two weeks before the robbery for which Clark had also been charged. The court asked Clark if he understood and agreed to this, and he said "Yes[.]"

The record reflects that the defense agreed that identity was at issue and consented to admission of the evidence of the robbery at the adult bookstore.

28

Therefore, Appellant has waived error as to this issue. Further, the defense also requested that the court limit admission of extraneous offense evidence to those that show a common scheme or plan. *See* Tex. R. Evid. 404(b). We conclude, based on the record before us, that the trial court limited the admission of extraneous offense evidence committed prior to the Circle K and adult bookstore robberies to other similar "takeover robberies" and the trial court concluded that identity was at issue and the other offenses tended to prove a common scheme or plan under Rule 404(b). Therefore, we cannot say that the trial court's ruling was outside the zone of reasonable disagreement. We conclude that the trial court did not err in admitting evidence of extraneous offenses under Rule 404(b). We need not address whether any such evidence was also admissible as same transaction contextual evidence. *See* Tex. R. App. P. 47.1. Because we find no error, we also need not determine if any such error was harmful, resulted in an improper verdict, and affected Clark's substantial rights. *See* Tex. R. App. P. 44.2(b); *Gonzalez*, 544 S.W.3d at 373. That said, we also find that Appellant's brief fails to present a harm analysis or explain how the admission of the complained-of evidence affected his substantial rights or resulted in an improper verdict. *See id.* We overrule Appellant's second issue on appeal.

Appellant's third issue argues that the trial court failed to conduct a Rule 403 balancing test in admitting evidence of extraneous offenses and that "[t]he

extraneous aggravated robbery offense evidence was not needed by the State to prove anything[.]" As we have already noted above, the trial court stated that identity was at issue, to which the defense agreed, and evidence of the takeover-style robberies tended to prove a common scheme or plan. The appellate record does not affirmatively show that the trial court refused to conduct a Rule 403 balancing test. We presume the trial court engaged in a balancing test before admitting the evidence. *See Williams*, 958 S.W.2d at 195. Furthermore, Rule 403 favors the admission of relevant evidence, and relevant evidence carries a presumption that it is more probative than prejudicial. *See id.* at 196. Appellant has failed to overcome the presumption that the evidence was more probative than prejudicial. *See id.* at 195-96. We overrule Appellant's third issue.

## Effective Assistance of Counsel

Appellant's fifth and sixth issues argue that he was deprived of the effective assistance of counsel because his trial counsel failed to object to the admission of extraneous-offense evidence as "non-contextual" and he also failed to object to the extraneous evidence as inadmissible under Rule 404(b). We analyze these issues together.

To establish ineffective assistance, a defendant must satisfy the following test:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the

30

> deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Perez v. State*, 310 S.W.3d 890, 892-93 (Tex. Crim. App. 2010). Allegations of ineffective assistance "must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). "Appellate review of defense counsel's representation is highly deferential and presumes that counsel's actions fell within the wide range of reasonable and professional assistance." *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). The appropriate context is the totality of the representation; counsel is not to be judged on isolated portions of his representation. *See Thompson*, 9 S.W.3d at 813; *Solis v. State*, 792 S.W.2d 95, 98 (Tex. Crim. App. 1990). The challenged conduct will constitute ineffective assistance only when "the conduct was so outrageous that no competent attorney would have engaged in it." *See Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001).

"The two prongs of *Strickland* need not be analyzed in a particular order[.]" *See Ex parte Martinez*, 330 S.W.3d 891, 901 (Tex. Crim. App. 2011). Failure to satisfy either prong of *Strickland* is fatal. *See Ex parte Martinez*, 195 S.W.3d 713, 730 n.14 (Tex. Crim. App. 2006). "The Court of Criminal Appeals has noted that the standard for showing prejudice on a claim of ineffective assistance of counsel is

31

more demanding than the showing needed to prove harm under the Rules of Appellate Procedure." *Thomas v. State*, 445 S.W.3d 201, 210 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) (citing *Martinez*, 330 S.W.3d at 903). "To prevail, [appellant] must show a reasonable probability that but for his counsel's deficient performance, the result of the proceeding would have been different." *Id.* (citing *Bone*, 77 S.W.3d at 833).

To successfully assert that trial counsel's failure to object amounted to ineffective assistance, the applicant must show that the trial judge would have committed error in overruling such an objection. *See Martinez*, 330 S.W.3d at 901 (citing *Ex parte White*, 160 S.W.3d 46, 53 (Tex. Crim. App. 2004); *Vaughn v. State*, 931 S.W.2d 564, 566 (Tex. Crim. App. 1996)).

Ordinarily, on direct appeal, the record will not have been sufficiently developed during the trial to demonstrate in the appeal that trial counsel provided ineffective assistance under the *Strickland* standards. *Menefield v. State*, 363 S.W.3d 591, 592-93 (Tex. Crim. App. 2012). Before we denounce trial counsel's actions as ineffective, counsel should normally be given an opportunity to explain the challenged actions. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). When counsel has not been given an opportunity to explain the challenged actions, we will find deficient performance only if the conduct was "so outrageous that no competent attorney would have engaged in it." *Id.*

32

Clark did not file a Motion for New Trial or present any evidence as to the basis for counsel's reasoning for why he did not object to the admission of extraneous-offense evidence as "non-contextual" or otherwise object to the evidence as inadmissible under Rule 404(b). Because the record is silent as to the reasons for counsel's conduct, we may not speculate to find counsel's performance deficient. *See Bone*, 77 S.W.3d at 835. That said, as we have noted, the trial court conducted a pretrial hearing on the defendant's objections under Rule 404(b). Furthermore, the record in this case reflects that Appellant's trial counsel objected to the admission of extraneous-offense evidence at several points during the trial. Appellant's brief does not specify when or how trial counsel should have objected in addition to these instances. Moreover, Appellant's brief fails to present argument as to how he was prejudiced by his trial counsel's alleged deficiencies other than conclusory statements that he was deprived of his "constitutional right to be tried solely for the offense for which he was indicted[]" and that it deprived him of a "'crucible of meaningful adversarial testing[,]'" citing to *Moran v. Burbine*, 475 U.S. 412, 431 (1986) (citing *United States v. Cronic*, 466 U.S. 648, 656 (1984)). A conclusory statement that the defendant was prejudiced by his trial counsel's allegedly deficient performance is inadequate to establish prejudice under *Strickland*. *See Ex parte Parra*, 420 S.W.3d 821, 828 (Tex. Crim. App. 2013). We conclude that Appellant has not met his burden to show that his trial counsel's performance was deficient or

that, but for counsel's deficient performance, the result of the proceeding would have been different. *See Thomas*, 445 S.W.3d at 210 (citing *Bone*, 77 S.W.3d at 833); *see also Martinez*, 195 S.W.3d at 730 n.14. We overrule Appellant's fifth and sixth issues.

Having overruled all of Appellant's issues, we affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on June 23, 2021
Opinion Delivered November 24, 2021
Do Not Publish

Before Golemon, C.J., Horton and Johnson, JJ.